Banker *v.* Caldwell.

---

ISAAC A. BANKER, Appellant, *vs.* JAMES Y. CALDWELL, Respondent.

APPEAL FROM THE DISTRICT COURT OF RAMSEY COUNTY.

"A set of abstract books, and books of indexes, containing complete abstracts of title to all the lands situated in Ramsey County, with the incumbrances and liens upon the said lands, prepared at great cost and labor and skill of the Plaintiff, of the value of five thousand dollars," are the proper subjects of protection by copyright, as original books, so long as the author retains the ownership of the manuscript thereof.

A levy upon such property would not deprive the owner of any right therein, except the immediate possession and control of it, and payment of the debt entitles the debtor to a return of the property in the same condition in which it was at the time of the seizure, usual wear and tear of removal and preservation only excepted.

The Sheriff acquires no personal right of possession to property under a levy. His possession is that of the law, whose agent he is, and he has no right to use the property or profit by its possession in any way whatsoever. The owner's right to possess, use or dispose of the property is suspended in the interval between the levy and sale, but he may regain these rights any moment before the sale, by payment of the debt.

The Plaintiff, Banker, in his complaint states that he was the owner and in possession of a certain set of abstract books and books of indexes containing complete abstracts of title to all the lands situated in Ramsey County, with the incumbrances and liens upon the same. That said books had been prepared at great cost and expense, and labor and skill of the

Plaintiff and others, and were of the value of five thousand dollars. That the Defendant, James Y. Caldwell, as Sheriff of Ramsey County, had levied upon said books and abstracts by virtue of an execution issued upon a judgment against the Plaintiff, and were now in the said Sheriff's hands, subject to said levy, and no sale thereof had been made. That shortly after the same came into the Defendant's custody, he had, without the knowledge or consent of Plaintiff, clandestinely caused full and complete copies of said books and abstracts to be made, for the purpose of selling the same to one Edward Heenan or some other person,

And demands an injunction to restrain the sale of said copies, and for a delivery thereof to the Plaintiff, &c.

The Defendant demurred to the complaint upon the grounds that it did not appear therefrom that the Plaintiff was entitled to any exclusive right to, or property in the matter contained in said books and indexes, and because the Defendant, under the facts alleged in the complaint, had the right to copy said books, &c., for the purpose of sale or for any lawful purpose, and for other reasons which it is unnecessary to state here.

The District Court sustained the demurrer and the Plaintiff appeals.

The following are the points and authorities relied on by the Counsel for Appellant:

The demurrer makes these points:

1.   That Plaintiff has no exclusive property or right in the books of abstracts and indexes.

2.   That Defendant being legally in possession under the execution had a right to copy them for any purpose.

3.   That it does not appear that Plaintiff has been or will be damaged by the acts of Defendant.

4.   That he is not entitled to the relief demanded.

*First.*—1.  The complaint states the Plaintiff to be the owner of books of abstracts and indexes, that they contain complete and perfect *abstracts of titles* to all the lands in Ramsey County, with the liens and incumbrances thereon; that they had been *prepared* at great *care, labor and skill* of Plaintiff

and others, (those from whom he purchased,) that they were chiefly made valuable because of such *care, labor and skill*, and were of the value of $5,000.

From these facts, the nature, character and arrangement of the contents of the books fully appear. The phrase *"abstract of title"* has a well settled legal signification. It signifies "a brief account of the title to real estate." *See Bouv.'s Law Dic.* 42; *Preston on Abstracts of Titles;* 2 *Sugden on Venders* 57 *to* 88; *Wharton's Law Dic.* 10.

2. The books therefore contain brief statements of everything affecting title to all the lands in Ramsey County, prepared, (not copied,) compiled and condensed from original sources of information, the original deeds or the records of the County.

Plaintiff's rights are those of the author or compiler of an original work.

3. The author of an original work has at common law a copyright in, that is, an exclusive right to make and sell copies of his work. *See* 2 *Black. Com.* 406; 2 *Kent's Com.* 437 (365); *Curtis on Copyright* 19 *and* 20; *Eden on Injunction* 308 *and notes; Miller vs. Taylor, Burrow's Rep.* 2303; *Donaldson vs. Beckett, Burrow's Rep.* 2408; *Hoyt vs. McKenzie*, 3 *Barb., Ch. Rep.,* (*N. Y.*) 320; *Wetmore vs. Scofield et al*, 3 *Edw'ds Rep.* (*N. Y.*) 515.

4. The right is not taken away by the author selling copies, unless he thereby evince an interest to dedicate the work to the public. *See Miller vs. Taylor, above; Donaldson vs. Beckett, above.*

5. The right is independent of the statute of copyright and is not taken away by it. *See same cases.*

The doubt as to the effect of the English statute in the above cases, arose on a proviso, which is not in the Federal statute.

Besides the Federal statute could not and was not intended to affect the common law of the several States. *See Wheaton et al vs. Peters et al*, 8 *Peters U. S. Rep.* 591.

6. But the doctrine of copyright is not necessary to sustain Plaintiff's title, for all the cases agree, that an author has an

exclusive property in his manuscript work, (before he abandons it by publication or otherwise,) which property the law will protect against invasion by any one. *See Miller vs. Taylor, above,* 2340, 2356, 2360, 2369, 2378, 2379 *and* 2396; *Pope vs. Carl,* 2 *Atkins' Rep.* 342 ; *Thompson et al vs. Stanhope et al, Ambler's Rep.* 737 ; *Wheaton et al vs. Peters et al,* 8 *Peters U. S. Rep.* 591.

7. That the work is composed of materials not originated by the author, but which are accessible to everybody, does not prevent his having property in it if the arrangement, compilation, condensing and preparation of such materials in the work are the product of his labor, care and skill, and give value to the work.

This is the case with maps, charts, scientific and text books, reporter's notes, translations and works of the like kind. *See Story's Eq. Juris.,* note to sec. 940 ; *Gray vs. Russell,* 1 *Story's Rep.* 11 ; *Matthewson vs. Stockdale,* 12 *Vesey Rep.* 270 ; *Longman vs. Winchester,* 16 *Vesey Rep.* 268 ; *Wilkin vs. Aiken,* 17 *Vesey Rep.* 424 ; *Casey vs. Longman & Russel,* 1 *East. Rep.* 358.

8. The books of abstracts and indexes are on a par with the works before referred. It is not necessary that the *method* of arranging the materials should be *invented* by the author. It is enough that the work is the result of his care, labor and skill, and is not copied from another work.

*Second.*—The Sheriff under his levy had a right only to take possession of and sell the books pursuant to the statute. His being rightfully in possession gave him no right to make copies. *See Miller vs. Taylor, above,* 2378 *and* 2379 ; *Thompson et al vs. Stanhope et al, Ambler's R.* 737.

*Third*—The books were of such a character that multiplying copies would inevitably diminish the value of the originals. That this is sufficient damage to sustain the action—*see Story's Eq. Juris. Sec.,* 940 *and note ;* 11 *Simon's Rep.* 31.

*Fourth.*—The relief sought does not regard the originals, (which are held by the levy,) but only the copies wrongfully taken. It is two fold—1st, by injunction ; 2d, for the delivery of the copies.

1. That injunction is a proper remedy. *See Thompson et al vs. Stanhope et al, Ambler's Rep.* 737 ; *Pope vs. Carl,* 2 *Atkins* 342 ; *Matthewson vs. Stockdale,* 12 *Vesey* 270 ; *Longman vs. Winchester,* 16 *Vesey,* 268 ; *Hoyt vs. McKenzie,* 3 *Barb. Ch. Rep.* (*N. Y.*) 320 ; *Wetmore vs. Scofield et al,* 3 *Edwards Rep.* (*N. Y.*) 515.

2. Plaintiff is entitled to a delivery of the copies because they are his.

Defendant has wrongfully intermingled in the copies, his property in the paper, ink and labor of copying, with Plaintiff's property in the compilation or preparation of the materials into the form of abstracts. On the doctrine governing the cases of confusion by goods, the copies are Plaintiff's. *See* 2 *Black. Com.* 405 ; 2 *Kent Com.* 297 ; 2 *John. Chan. Rep.* 62 ; 1 *Bouv. Law Dic.* 270 ; *Miller vs. Taylor, above,* 2349.

The following are the points and authorities relied upon by the Counsel for Respondent :

*First.*—That the demurrer to the complaint in this action was properly sustained, and the judgment below was correct, because the complaint does not state facts sufficient to constitute a cause of action or to entitle the Plaintiff to any relief therein demanded :

*Second.*—Because it is stated and appears from the complaint that the Plaintiff was on the 31st day of August, 1858, and afterwards continued to be the owner of the abstract books and books of indexes in the complaint mentioned, and that the Defendant, as Sheriff and by authority of law, duly and legally levied upon and took the books and indexes in question under an execution as the property of the Plaintiff, as required by the law to do. It therefore appears from the complaint that the Defendant became and was rightfully in possession of the books.

*Third.*—Because it also appears that the execution was issued and delivered to the Defendant, and the books levied upon on the 31st of August, 1858, and that the time for the

Banker *v.* Caldwell.

return of the execution (60 days) had not expired when this action was commenced.

*Fourth.*—Because it appears from the complaint that the books and indexes in question were copied and the contents thereof taken from the public records of the County in the Register of Deeds and Clerk's offices, and that the same duly contained such facts and information as are contained in the public records of said County, which are by law open and accessible to the public, and inasmuch as it does not appear that the Plaintiff had acquired and possessed, or could acquire or possess any *exclusive* right to, or property in, or control over the information, facts and matters therein contained, to the exclusion of others.

*Fifth.*—Because the Defendant having lawfully and rightfully become possessed, and being in the rightful possession of the said books and indexes, might rightfully copy the same, or cause them to be copied without any actual injury to the same, or impairing or detracting from the information and matters contained therein, for the purposes stated in the complaint, or for any other lawful purpose whatever.

*Sixth.*—Because the complaint does not state or show how or wherein the Plaintiff has or will be damaged, or sustain any loss by reason of the acts of the Defendant, inasmuch as it does not appear that the multiplication of copies would affect or injure the Plaintiff's interest.

*Seventh.*—That the common law doctrine of copyright for the protection of authors and literary writers, does not apply to this case, inasmuch as it is not stated or pretended that the books or their system, style or matter, are the original or intellectual productions of the Plaintiff.

BRISBIN & BIGELOW, and J. & C. D. GILFILLAN, Counsel for Appellant.

M. E. AMES, Counsel for Respondent.

*By the Court*—FLANDRAU, J. The character of the books for which a copyright or exclusive property at the common

law is claimed in this case, is thus given in the complaint: "A certain set of abstract books and books of indexes, containing complete abstracts of title to all the lands situated in the said County of Ramsey, with the incumbrances and liens upon the said lands, prepared at great cost and expense and labor and skill of the Plaintiff and others, of the value of five thousand dollars."

The Court below decided that the books were not of a character which entitled them to the protection given to works of originality, as "it may be inferred that said books are copies, condensed it may be, of the public records of the County."

I do not know of a technical expression that is susceptible of, or has obtained a more definite and certain signification than the one used to designate the nature of these books; "abstracts of title" have been the subject of treatises by learned commentators, and find a place in almost all law dictionaries. *See Preston on Abstracts; Lee on Abstracts. In Burrill's Law Dictionary, Vol. 1, page 12,* the following apt and clear definition of the term may be found:

"In conveyancing, an abstract or summary of the most important part of the deeds and other instruments composing the evidences of a title to real estate, arranged usually in chronological order, and intended to show the origin, cause and incidents of the title, without the necessity of referring to the deeds themselves. It also contains a statement of all charges, incumbrances, liens and liabilities to which the property may be subjected, and of which it is in any way material for purchasers to be apprized. Abstracts of title constitute an important part of the learning of conveyancing, and in England have been illustrated by treatises expressly devoted to the subject."

In describing a book which contained complete abstracts of title to all the land in a county, it would seem to me tautological after stating such to be their contents, to enter into detail and give the particular arrangements of title and incumbrances, &c., because no matter what plan the compiler had adopted, if the books were abstract books and presented a complete history of the title and incumbrances of the land

comprised within them, the manner in which it was presented would not affect their character one way or the other.

I think the description of the books as "abstract books and books of indexes," &c., given in the complaint, must be understood to mean that they were books of the character defined in the law dictionaries under the head quoted, and not mere copies of the records.

That the making of a perfect abstract of the title to a piece of land, with all the incumbrances which affect it, involves a great exercise of legal learning and careful research, I presume no lawyer will dispute. The person preparing such an abstract must understand fully all the laws on the subject of conveyancing, descents and inheritances, uses and trusts, devises, and in fact every branch of the law that can affect real estate in its various mutations from owner to owner, sometimes by operation of law, and again by act of the parties.

But the preparation of a set of abstract books which contain histories of all the titles in a county, with indexes, not only involves all the legal learning requisite to the arrangement of a single abstract, but in addition, a great amount of skill in methodizing them into an harmonious whole, convenient of access, which skill alone, independent of the making of the abstracts, is the proper subject of protection by copyright.

Indexes to works may be copyrighted. An index to the Constitution of the United States, or the Holy Bible, may be a very valuable contribution to the number of literary productions. Certainly any one who has examined Cruden's Concordance of the Bible, would never deny to him the fame of having conferred upon the world a work of inestimable value, yet it is but an index after all.

It has been a very difficult question in the Courts to determine what is original and what borrowed or pirated, in a literary production. It cannot be necessary that the matter contained in a work, the thought, sentiment and language should be all original, to entitle the author to the protection of a copyright, because if such was the case, in the present advanced state of the sciences, learning and literature, we might look for very few additions which would fall within the

privileged sphere.   It would exclude *critiques* upon the literary performances of others, abridgements of works beyond the reach of many, which now form a large portion of the means through which knowledge is conveyed to the people—Encyclopedias, Gazetteers, Anthological Dictionaries, and a thousand other works—which although in the great part composed of extracts from the works of others, are by their peculiar arrangement most valuable acquisitions to the general store of knowledge, and in many cases exhibit a degree of research and learning quite equal to that displayed by authors of works purely original.   It would be unfair to say that the mind that devotes a life time to culling the fruit and flowers from the wilderness that many laborers in an uncultivated field have caused to spring up and obscure a subject, and succeeds in rendering its otherwise forbidding approaches attractive and facile to the student, is not entitled to the same protection as he who dropped some of the original seed.

*In Story's Eq. Jur.*, *Sec.* 940, where this subject is largely discussed, he cites as examples of works which may be considered as entirely original, those of Milton, Pope and Sir Walter Scott, although he says they have freely used the thoughts of others.   "Of others again, the original ingredients may be so small and scattered that the substance of the volumes may be said to embrace little more than the labors of sedulous transcription and colorable curtailments of other works.   There are other examples of an intermediate class where the intermixture of borrowed and original materials may be seen in proportions more nearly approaching to each other, and there are others again as in cases of maps, charts, translations and road books, where the materials being equally open to all, there must be a close identity or similitude in the very form and use of the common materials."

The case of maps and charts bears a very strong resemblance to the case at bar; there the material from which the map is taken, like the records of a county, are open to all.   If the combined labors of the surveyor, the topographer, the historian and the artist furnish a map by which at one view a perfect knowledge may be had of the district of country repre-

sented, including climate, soil, productions, surface, distances, views, cities, &c., surely the compiler and delineator of such a chart should be protected and secured in the profits of his labors, against those who would appropriate them by mere transcription. Yet notwithstanding this, any other person may use the same material and produce another map of the same country, which, if the first was perfect, must for its merit depend upon its resemblance to it, and should the second map be a *fac simile* of the first, if it was *bona fide* the result of the original efforts of the author, it would be entitled to equal protection. A map is but a transcript of the region which it portrays, narrowed in compass so as to facilitate an understanding of the original. It may be said to be an abstract of the original, in the only way that the subject is susceptible of being condensed and abridged. It is a key to nature's record, as the Plaintiff's abstracts were keys to the records of the titles of Ramsey County; the one is as much entitled to protection for originality of construction as the other.

There are numerous cases reported, illustrating the nature of those original works that are entitled to the privilege of copyright, which are cited with lengthy extracts from the opinions of the judges who decided them, in *note* 2, *page* 271, *Vol.* 2 *of Story's Eq. Jur.*, and I think the principle which runs through the reported cases would include the Plaintiff's abstract books within the privileged class of works.

In the case of *Wheaton and Donaldson vs. Peters & Gregg,* 8 *Peters U. S. R.* 591, the question of the common law right of authors to an exclusive property in their works is very fully discussed both in the opinion of the Court, delivered by Mr. Justice McLean, and in the dissenting opinion of Judge Thompson. From the review of the English cases made in that cause, it would seem that there it was decided in the Court of King's Bench in 1769, in the case of *Miller vs. Taylor*, reported in 4*th Burr* 2303, that the common law gave an author a copyright in his works in perpetuity. The law was considered settled on this point, until the case of *Donaldson vs. Beckett,* 4 *Burr* 2408, decided in 1774 in the House of Lords, changed it to the extent of holding that the right

was taken away by the statute of 8 *Anne c* 19, or at least that the remedy must be upon the statute. But it would seem that the law is not firmly settled in England since the last decision, as Courts of Equity have frequently granted injunctions to restrain the publication of works, which is a remedy different from that given by the statute. *See cases cited in opinion of Justice Thompson in* 8 *Peters* 591.

But whatever may have been the rights of authors at common law, it is clear that in the United States an author has no exclusive property in a published work except under some act of Congress. 8 *Peters* 591:

The Plaintiff's books were not published, and while he remained the owner of the manuscript his property in it was exclusive as against the world. None of the cases which I have referred to dispute this doctrine, but on the contrary most of them expressly make the distinction in favor of the exclusive right of any person in the manuscript of his own works; not the material simply, but the thoughts and ideas, so long as they remain unpublished. Justice McLean says in his opinion in 8 *Peters* 591, "That an author at common law has a property in his manuscript and may obtain redress against any one who deprives him of it, or by improperly obtaining a copy endeavors to realize a profit by its publication, cannot be doubted, but this is a very different right from that which asserts a perpetual and exclusive property in the future publication of the work after the author shall have published it to the world."

It is the publication which is regarded as an abandonment of the exclusive property in the contents. It is a voluntary presentation of it to the public, and any one may use it to such purpose as he may see fit.

The Judge in delivering his opinion in the Court below, uses the following language. "Moreover, I am inclined to think that whatever his rights might be were the books in his possession, (that is, the Plaintiff,) his right to prevent copies being taken ceases with the loss of possession, all his right passed beyond his control by the levy, while such levy existed." I think the learned Judge certainly goes a great

way beyond the law in holding that a Sheriff may use property which he has possession of under a levy for his own advantage, or that he can do anything concerning it save to preserve it for the best interests of the debtor and creditor for whose mutual benefit he holds it.    I do not think a debtor loses any rights in his property when it is levied upon, save and except the immediate possession and control of it, and on payment of the debt has the right to have it returned to him in exactly the same condition in which it was at the time of the seizure, usual wear and tear of removal and preservation only excepted.    The Sheriff has no personal right of possession; his possession is that of the law, whose agent he is, and he has no right to use the property or profit by its possession in any way whatever.    In the interval between the levy and sale, the debtor is not divested of his ownership in the property, but the incident of title, the right to possess, use and dispose of the property is suspended only, which he may regain, at any moment, by paying the debt.

There can be no doubt that the Sheriff was guilty of a flagrant violation of his duty in copying the Plaintiff's books, and that an action will lie against him for the damage the Plaintiff has sustained by reason of his misconduct.    It was a proper case for the equitable intervention of the Court by injunction to restrain the issuing of the copies by sale or otherwise, to the damage of the Plaintiff.

The Court erred in sustaining the demurrer to the Plaintiff's complaint, and the judgment should be reversed.